## SEABOARD SURETY CO. v. BRAUER.

Court of Appeals of Kentucky.

June 8, 1951.

Mahan, Davis & Mahan, Louisville, Alfred W. Minish, Lawrence C. Jenkins, Lexington, for appellant.

Stoll, Keenon & Park and Robert M. Odear, all of Lexington, for appellee.

SIMS, Justice.

Appellant, Seaboard Surety Company, sued appellee, Albert Brauer, for $1524.68. for what it alleged was the balance of the premiums due it on two insurance policies issued to appellee and had been cancelled by him. The answer as amended was a general denial followed by an affirmative plea that the policies had been cancelled not by appellee but by the company, and by way of counterclaim he sought to recover from the company $599.69 he averred he overpaid in premiums on the policies.

Both policies bear date of March 12, 1946, and recite they expire on March 12, 1948, and it is stipulated the company cancelled the two policies on Nov. 29, 1947. Appellee appears to have been in the business of mining fluorspar in Woodford and Mercer counties, Kentucky, and carried his own workmen's compensation insurance. Policy #1 re-insured appellee to the extent of $100,000, and policy #2 was a specific catastrophe excess loss contract which protected appellee to the extent of $200,000. The two policies were interdependent and recite appellee could not carry one without carrying both.

The trial judge's opinion stated that the first contract is so ambiguous as to defy understanding, and he denied recovery to either party against the other and adjudged each should pay its and his own costs. The company asks that the judgment be reversed on the ground that the "words, terms and phrases" are defined in the contracts and when these definitions are applied to the instruments, the same become plain. While appellee insists that the policies are ambiguous and as they are susceptible to more than one meaning, the court should adopt the construction most favorable to the insured.

We have never seen a contract more confusing nor one as difficult to construe as the first policy. Item #4 of its "Declarations" provides: "The Minimum Premium for this Contract shall be $2500. Total Estimated Normal Premium $4,082.-25. The Premium for this Contract shall be computed at the rate of 30 percent of the 'Normal Premium'. Premium Adjustment: Annual. Deposit Premium $1,224.-68".

Item #6 thereof reads: "The aggregate Contract Limit is $100,000 in excess of Reinsured's Retention of 70% of the 'Normal Premium' subject to Reinsured's Minimum Retention of $6,000."

We now go from the "Declarations" to the "Conditions" of policy #1. Condition #4 reads:

"Premium. The Reinsured shall pay the Reinsurer the Deposit Premium stated in Item 4 of the declarations at the time this Contract takes effect. The Deposit Premium shall be held by the Reinsurer to be applied against the audited premium to be determined subsequent to the expiration or termination of this Contract as provided by Condition 11. If the Contract provides for interim Deposit Premium Adjustment, the Reinsured shall file with the Reinsurer a written statement of the Normal Premium developed for each such interim period, determined in accordance with the provisions of the Contract. The Reinsured shall promptly pay the Reinsurer additional deposit premiums computed at the rate of percent of Normal Premium as developed by such statements, which additional deposit premiums shall be held together with the initial deposit premium by the Reinsurer to be applied against the audited premium to be determined subsequent to the expiration or termination of this Contract. If the earned Premium shall then be greater than the deposit premiums previously paid by the Reinsured, the Reinsured shall thereupon pay the difference to the Reinsurer; if it is less the Reinsurer shall thereupon refund the difference to the Reinsured, but in no event shall such difference reduce the earned premium retained by the Reinsurer below the Minimum Premium shown in Item 4 of the declarations.

"If at any time during the period of this Contract it shall appear that the deposit premium has been underestimated, the Reinsurer may call upon the Reinsured for an additional premium computed upon the basis of the pro rata percentage increase of the new estimates of payrolls over original estimates of payrolls, with respect to each classification set forth in Item 4 of the Declarations."

Condition 11 to which reference is made in #4 reads: "Inspection and Audits. The Reinsurer or its duly authorized representative shall be permitted to inspect the premises, operations, machinery and appliances of the Reinsured at any reasonable time while this Contract is in force; and to examine and audit the books and records of the Reinsured at any time while this Contract is in force and within one year

after its termination, so far as they relate to the premium basis of this Contract."

Condition #3 defines the "Normal Premium" in these words:

"Normal Premium. The term 'Normal Premium' as referred to in the declarations is defined as the premium derived by multiplying the entire remuneration earned by all 'Employees' by the rates as defined herein for the various operations conducted, regardless of whether such operations are specifically described or rated in the declarations.

"The rate of premium to be applied for the classification of operations as described in the declarations and such additional operations as may be conducted for the purpose of determining the 'Normal Premium', shall be rates equal to those established by the Workmen's Compensation Rating Bureau having jurisdiction or as otherwise agreed."

The second paragraph of condition #13 reads: "If the Reinsurer cancels, the 'Minimum Premium' and the Reinsured's Minimum Retention set forth in Item 6 of the declarations shall be reduced prorata. If the Reinsured cancels, the 'Minimum Premium' and the Reinsured's Minimum Retention set forth in Item 6 of the declarations shall not be reduced."

While the provisions of the first policy are quite complicated and confusing, we believe the parties can set them out in their pleadings, along with the facts and figures involved in the case, so that the policy may be construed by the court with some degree of accuracy and a determination made as to which of the parties is indebted to the other and the amount thereof. It may be necessary to take proof to show the number of employees and the amounts paid each in determining the "Normal Premium" under condition #3 of the first policy. Also, the pleadings should show what audits were made under condition #11 of that policy and proof may be necessary to show what the audits disclosed. The pleadings should further show what "Pro-rata" was due upon cancellation of the policies.

■ What has been said relative to the first policy applies in some degree to the second one. It is unnecessary for us to set out in minute detail the "Declarations" and "Conditions" in the second policy, but by properly pleading and proving the facts and figures coming under its "Declarations" and "General Conditions" the parties should be able to put the record in such shape that the court can determine their rights. However, it will be necessary to carefully plead the various terms of this second policy, as well as the first, and their relations to each other and to put in the record by proof or stipulation the figures which form the basis for the determination of the premium on each policy and what amounts on the two premiums have been paid. The failure of the parties to do this makes this record unintelligible.

On page 5 of the brief appellant says: "Appellee failed to show any latent ambiguity, fraud, or mutual mistake in these contracts, and that the court erred in admitting the parol evidence introduced by appellee * * *". We find no proof whatever in the record and the case appears to have been submitted on the pleadings and a stipulation, which latter only shows the parties entered into the contracts, the dates and duration of same and the amount of premiums paid by insured.

■■ One reading the two policies is at once struck with the latent ambiguities they contain. We have reference to such expressions as "Total Estimated Normal Premium"; "Normal Premium"; "Premium Adjustment"; "Deposit Premium" and other such indefinite words, terms and phrases. True, the policies attempted to define some of these terms but the definitions fail to remove the latent ambiguities. Therefore, parol testimony may be introduced to explain these latent ambiguities. Wilson v. Robertson, 7 J.J.Marsh 78, 30 Ky. 78; Kentucky Citizens' Bldg. & Loan Ass'n v. Lawrence, 106 Ky. 88, 49 S.W. 1059, 20 Ky.Law Rep. 1700; Slusher v. Slusher, 102 S.W. 1188, 31 Ky.Law Rep. 570; Roberts v. Robert's Ex'r, 299 Ky. 646, 186 S.W.2d 801. There are also many patent ambiguities in these two insurance contracts and as the parties operated under them from March 12, 1946, to Nov. 11,

1947, and as the policies provided the Premium Adjustment shall be made annually, parol evidence may be introduced showing the interpretation placed on the contracts by the parties during the time they were in force. Hauck v. Jordan, 235 Ky. 388, 31 S.W.2d 624; Thompson v. Fairleigh, 300 Ky. 144, 187 S.W.2d 812.

The judgment is reversed for proceedings consistent with this opinion.